In the
United States Court of Appeals
For the Seventh Circuit

No. 99-1664

James F. Jackson,

Plaintiff-Appellant,

v.

Rockford Housing Authority,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 96 C 50348--Philip G. Reinhard, Judge.

Argued January 4, 2000--Decided May 23, 2000


 Before Cudahy, Kanne, and Diane P. Wood, Circuit
Judges.

 Cudahy, Circuit Judge.

I.  Facts

 James Jackson, a male African-American, has been
employed with the Rockford Housing Authority
(RHA) since 1981, and currently serves as a
development manager. The RHA provides low-income
public housing. The Department of Housing and
Urban Development (HUD) subsidizes RHA and other
local housing authorities, and it regulates low-
income housing projects. In December 1985,
Jackson applied for the position of Senior
Housing Manager with the RHA. Steven Anderson, a
male Caucasian, also applied for the position.
Alfred Brewington, the Director of Management
Services for the RHA, interviewed both Jackson
and Anderson for the Senior Housing Manager
position. Don Johnson, RHA's Executive Director,
made the ultimate hiring decision. In 1986, he
promoted Anderson to the job. Executive Director
Johnson is now deceased. Jackson claims that when
Brewington interviewed him, Brewington remarked
that Jackson and Anderson were equally qualified.
From the time RHA selected Anderson for the
position, until July 1995, Jackson never asked
Brewington or Johnson why he lost out on the
Senior Housing Manager position. Jackson was
never informed that his race stood in the way of
the promotion.

 Jackson now contends that he recently found out

he was better qualified than Anderson for the Senior Housing Manager position and that RHA discriminated against him by hiring an inferior white candidate. The RHA position description stated that the required education and experience were:

 B.S. in business administration, public administration, real estate or closely related field, plus five years experience in business or property management. Experience in assisted or public housing preferred.

 Or

 High school diploma or equivalent plus ten years experience in business or property management. Experience in assisted or public housing desired, totaling at least six years. Incumbent must possess a Public Housing Manager's certificate from a HUD approved Certifying Organization or capability of becoming certified. Possession of a drivers license and own transportation is a requirement, since an incumbent must travel to perform duties.

See Record Vol. 1, Tab D (Plaintiff's Documents in Support of Rule 12(M) Statement).

 At the time Jackson and Anderson submitted their applications, both worked as project managers for the RHA and held college degrees; however, neither held degrees in the desired fields. Anderson had more than ten years experience in property management, including six years in assisted housing and three months experience as a property manager for the RHA. He did not possess a Public Housing Certificate. Jackson had gained three years property management experience with public housing, and he did possess a Public Housing Certificate.

 In June or July of 1995 (the record is inconsistent), Jackson learned that Anderson had just recently received his Public Housing Certificate, and calculated that Anderson had not possessed the certificate at the time of their interviews. On August 23, 1995, Jackson filed a complaint with the Equal Employment Opportunity Commission alleging discrimination. Following receipt of his Notice of Right to Sue, Jackson filed the present action on October 1, 1996, alleging that the RHA, or its agents, in violation of Title VII of the Civil Rights Act of 1964, failed to hire him due to his race despite his greater qualifications, and concealed its discrimination from 1986 to 1995.

 In the RHA's answer to Jackson's complaint, it did not allege that the statute of limitations

had expired. On June 23, 1998, the RHA moved for summary judgment, asserting that Jackson had failed to make a prima facie case of discrimination and that his charge of discrimination with the EEOC was filed untimely. Jackson responded that RHA had waived the statute of limitations issue by failing to properly raise it earlier, in its answer. The trial judge noted that both parties' briefs on the motion for summary judgment addressed the statute of limitations issue. After a status hearing and a briefing period, the district court permitted RHA to file an amended answer raising the affirmative defense of untimeliness. The district court eventually granted summary judgment to the RHA on that basis.

Jackson now appeals on two grounds. First, he contends that the district court improperly encouraged RHA to amend its response. Second, he contends that the judge erred in granting summary judgment on the statute of limitations ground because the RHA should have been equitably estopped to rely on the limitations period or the period should have been equitably tolled.

II. Analysis

A. Granting Leave to Amend the Complaint

Only if the district court abused its discretion in granting RHA leave to amend its answer will this court reverse. See Orix Credit Alliance, Inc. v. Taylor Machine Works, Inc., 125 F.3d 468, 480 (7th Cir. 1997). In this case, Jackson filed his complaint some eight years after Title VII's 300-day statute of limitations had expired. See 42 U.S.C. sec. 2000e-5(e). Jackson's complaint suggests he was well aware of the potential defense against his claim. He pleaded facts and drew conclusions that appeared to be a preemptive foundation for an equitable argument excusing his untimely complaint. For instance, he pleaded that RHA stated "at the time of selection" that he and Jackson were equally qualified (thereby throwing Jackson off the scent of discrimination). See Record Vol. 1 at Tab A, page 2 (Complaint). He also pleaded that RHA "conceal[ed] its discrimination against the Plaintiff . . . [which caused its] discrimination to be continuing and persistent." Id.

In its answer, the RHA did not raise the affirmative defense that Jackson had let the statute of limitations expire. But in a subsequent memorandum supporting its motion for summary judgment, RHA did raise the issue. In his response to RHA's motion for summary judgment, Jackson stated that RHA had waived the issue by failing to raise it in the answer. See Record

Vol. 2 (Plaintiff's Response to Defendant's Motion for Summary Judgment). Further, Jackson argued that based on facts pleaded in his complaint, he had no notice of his claims until the summer of 1995. See id. at 2. He concluded that "[t]he facts of this case demonstrate that equitable estoppel and tolling of the statute of limitations is applicable here." Id. at 3.

The district judge scheduled a status hearing to discuss the disparity between RHA's answer and its memorandum in support of summary judgment. At that hearing, the judge asked RHA whether it was moving orally for leave to amend the answer to raise the statute of limitations defense. It answered yes, and the judge gave it three days to file a motion and supporting brief. The judge gave Jackson four days to respond. See Record Vol. 1 at Tab A, page 8. When the briefs were filed, the district court granted leave to amend the answer.

Federal Rule of Civil Procedure 8(c) requires a defendant to plead a statute of limitations defense and any other affirmative defense in its answer to the complaint. See Fed. R. Civ. P. 8(c). On the other hand, the district court has the discretion to allow an answer to be amended to assert an affirmative defense not raised initially. See Fed. R. Civ. P. 15(a). Rule 15(a) states that "leave shall be freely given when justice so requires." See id. As a rule, we have allowed defendants to amend when the plaintiff had adequate notice that a statute of limitations defense was available, and had an adequate opportunity to respond to it despite the defendant's tardy assertion. See, e.g., Venters v. City of Delphi, 123 F.3d 956, 968 (7th Cir. 1997). The general rule that amendment is allowed absent undue surprise or prejudice to the plaintiff is widely adhered to by our sister courts of appeals. See, e.g., Brinkley v. Harbour Recreation Club, 180 F.3d 598, 612-13 (4th Cir. 1999) (collecting cases).

In one illustrative case, a plaintiff filed her First Amendment complaint about three months after the statute of limitations had expired. The defendant did not raise the statute of limitations defense until one month before trial, by which time "the parties had largely completed an exhaustive discovery process." See id. Further, the reply brief in which the defendant raised the defense was filed on the eve of oral argument before the district court, and the plaintiff's attorney did not receive a copy of the document until the morning of argument. Finally, the district court in Venters apparently did not require the defendant to file a motion for leave to amend the answer, did not permit the

plaintiff to file a surreply and gave the plaintiff just one day in which to submit evidentiary materials in opposition to the defense. See Venters, 123 F.3d at 968-69. We concluded that even though the plaintiff's knowledge of the timeline suggested that the statute of limitations had expired, she was not obliged to address the issue if the defendant had not. By permitting the defendant to raise the issue at the eleventh hour, and giving the plaintiff virtually no time to respond, we concluded that the district court had "bushwhacked" the plaintiff. See id. at 969.

We reached the opposite result in a similar case because the plaintiff had missed the statute of limitations deadline by more than two years rather than just a few months. See Blaney v. United States, 34 F.3d 509, 512 (7th Cir. 1994). Further, in Blaney, the defendants had raised the defense in a motion to dismiss, thus giving the plaintiff adequate time to reply and foreclosing the possibility that he was unfairly surprised by the development. See id. at 513.

In the present case, there is no question that Jackson knew his claims were stale. First, he missed the statute of limitations deadline not by a few months, but by several years. Second, Jackson himself pleaded facts that could help him evade the timeliness issue. Jackson's description of the RHA discrimination as a "continuing" offense and his reference to RHA's "conceal[ment]" of its discrimination suggest construction of a firewall against the statute of limitations defense. Record Vol. 1 at Tab A, page 2 (Complaint).

Further, there is no evidence that the district court prejudiced Jackson by permitting RHA to amend its answer. Indeed, unlike the court in Venters, the district court here was scrupulous in protecting Jackson's rights. It did not, as in Venters, accept a summary judgment motion at odds with the answer. It forced RHA to request leave to amend the complaint. It forced RHA to brief that motion. It gave Jackson several days to respond to RHA's motion. And it gave Jackson the opportunity to conduct additional discovery in order to produce facts in support of his opposition to the motion. See Record Vol. 1 at Tab A, page 17 (Order granting summary judgment motion). Finally, no trial date had been set. The case was still in the formative stages. As in Blaney, the court amply protected the plaintiff's procedural rights but determined that justice required permitting the submission of an amended answer. The district court did not abuse its discretion, and we affirm.

B.  Equitable Avoidance of the Statute of Limitations

Jackson tries to duck the statute of limitations by invoking equitable remedies in response to RHA's alleged "concealment" of its discrimination. We review de novo grants of summary judgment based on the statute of limitations. Kuemmerlein v. Madison Metro. Sch. Dist., 894 F.2d 257, 261 (7th Cir. 1990). Our examination has two parts. First, in terms of elapsed time, did the statute of limitations run? Second, is there any genuine issue of material fact regarding the time at which plaintiff's action accrued? See id. In this case, the parties agree that as a matter of time elapsed, the statute had run on the alleged hiring discrimination. The only issue is whether, due to RHA's alleged dissembling, Jackson may be excused for missing the statute of limitations.


i)  Equitable Estoppel
Equitable estoppel, also known as fraudulent concealment, is available if the defendant "takes active steps to prevent the plaintiff from suing in time." See Hentosh v. Herman M. Finch Univ. of Health Sciences/The Chicago Med. Sch., 167 F.3d 1170, 1174 (7th Cir. 1999) (citing Cada v. Baxter Healthcare Corp., 920 F.2d 446, 450-51 (7th Cir. 1990)). Active steps triggering equitable estoppel include hiding evidence or promising not to plead the statute of limitations. See id., citing Speer v. Rand McNally & Co., 123 F.3d 658, 663 (7th Cir. 1997); see also Mull v. ARCO Durethene Plastics, Inc., 784 F.2d 284, 292 (7th Cir. 1986). We have found equitable estoppel only where the defendant, in addition to committing the alleged wrong giving rise to the suit, has also tried to prevent the plaintiff from suing in time. See Cada, 920 F.2d at 451.

For instance, we found equitable estoppel to rescue a plaintiff who filed an untimely age discrimination suit because his employer seemed to lull him into delay. See Wheeldon v. Monon Corp., 946 F.2d 533 (7th Cir. 1991). In Wheeldon, the plaintiff alleged that he was the only one of several disgruntled workers that had a military pension. He contended that the company decided to set an example by firing him because he would suffer fewer economic consequences than other workers. See id. at 535. In Wheeldon, the plaintiff could have filed an age discrimination claim, but first elected to pursue a discrimination claim under the Vietnam Era Veterans Readjustment Assistance Act. See id. In order to pursue the veterans' claim on the plaintiff's behalf, the appropriate government

agency asked the employer whether it had government contracts that would support the agency's exercise of jurisdiction. See id. at 537. The employer did not have such contracts, but withheld its response until one day after the statute of limitations had run on the plaintiff's potential age discrimination suit. See id. We held that there was no excuse for the tardy response, and that given the injury inflicted on the plaintiff, equitable estoppel was warranted. See id.

In contrast, we have refused to grant equitable estoppel when the plaintiff retained the ability, notwithstanding the defendant's delay or resistance, to obtain information necessary to pursue his claim. In one such case, an employee association seeking a favorable IRS ruling about its retirement savings plan asked the IRS to turn over any administrative comments filed regarding the plan. See Flight Attendants Against UAL Offset v. Commissioner of Internal Revenue, 165 F.3d 572 (7th Cir. 1999). The relevant statute permitted the association to seek the comments from the employer, but the association failed to do so. The IRS did not respond quickly, and the association claimed that the delay in receiving crucial information caused it to miss the statute of limitations. See id. at 575-76. We did not apply equitable estoppel because the association could--and by statute should--have asked the employer rather than the IRS for the information. See id. An even less persuasive case, Hentosh, involved a female worker who filed a late suit for sex discrimination. The plaintiff alleged that the chairman of her medical school department made unwanted sexual demands on several of her coworkers, and then granted more favorable employment terms to some of those workers. 167 F.3d at 1172. The chairman eventually resigned, some of the information regarding his sexual demands came to light, and the plaintiff sued. She argued that equitable estoppel should apply because it was a "reasonable inference" that the chairman tried to conceal his advances. Id. at 1174-75. We rejected this argument because the "secret" advances were the cause of action; they were not propounded in order to conceal the cause of action. See id.

In the present case, Jackson argues that RHA concealed its racial discrimination by telling him that he and Anderson were equally well qualified when, in his opinion, he outranked Anderson by virtue of his PHC certification. But Jackson claims the remark was made during the interviewing process, before RHA hired Anderson. It seems to us that the comment could not conceal discrimination that had not yet taken place. Of course, if Anderson's hiring was a foregone

conclusion, then if RHA concealed Anderson's alleged inferiority at any point in the hiring process, that could have been an effort to hide the real considerations at play.

For the sake of argument, we will examine whether the offending statement actually misrepresented Anderson as Jackson's equal, and thus may be construed as an effort to hide a preference for the white candidate. As noted above, the RHA sought candidates with college degrees in business or public administration or real estate. Neither Jackson nor Anderson held such a degree, meaning that on this requirement they were equals. The RHA also sought five years experience in business or property management, with experience in assisted or public housing preferred. Anderson had ten years experience in property management, with six years experience in assisted housing, but just three months in public housing. Jackson had just three years property management experience but all in public housing. So Anderson had more general management experience, but Jackson had more public housing management experience. On this score, neither candidate was clearly superior. Finally, the RHA required that the winning candidate have a Public Housing Manager's certificate "or capability of becoming certified." Record Vol. 1, Tab D (Documents in Support of Rule 12(M) Statement) (emphasis added)./1 Jackson had a certificate; Anderson did not. But Anderson needed only to be capable of gaining certification. According to the HUD Public Housing Manager Certification Handbook, certification was designed to help managers cope with "increasingly complex fiscal, social and technical problems affecting [public housing authorities] of all sizes in all parts of the country." Id. at Tab H, page 2 (HUD Certification Handbook). "The primary method by which an individual may obtain certification is a written examination administered by one of the Approved Certifying Organizations." Id. at 4. Given Anderson's college degree and his extensive experience in property management, the RHA would certainly have been justified in thinking him "capable of becoming certified." Thus, on this count--and overall--the two were equally qualified./2 We fail to see how telling Jackson so amounted to concealment of racial considerations. If, between two workers with equal qualifications, the white worker is promoted, the possibility of racial preference is highlighted, not obscured. Had RHA wanted to hide any purported racial motive in its hiring, it would have been better off telling Jackson that Anderson was more qualified. Then Jackson would have thought that he lost on the merits, rather than on race. Assured their qualifications were similar, Jackson could reasonably have concluded

that race was a possible factor in the selection.

 Because the assessment that the two candidates were equally qualified was not a misstatement and was not likely to hide discrimination, it cannot easily be taken as an effort to conceal foul play. Therefore, we affirm the district court's denial of an equitable estoppel defense to the statute of limitations.


 ii)  Equitable Tolling

 Equitable tolling "permits a plaintiff to avoid the bar of the statute of limitations if despite all due diligence he is unable to obtain vital information bearing on the existence of his claim." Hentosh, 167 F.3d at 1174 (quoting Cada, 920 F.2d at 451). We have stated that to determine whether a plaintiff in fact lacked vital information, a court should ask whether a "reasonable" person in the plaintiff's position would have been aware of the possibility that he had suffered an adverse employment action because of illegal discrimination. Chakonas v. City of Chicago, 42 F.3d 1132, 1135 (7th Cir. 1994).

 Particularly in discrimination cases, which often emerge as the result of deep-seated suspicions held by those in protected classes, it may be difficult to say when a "reasonable" worker should be on notice that he has a claim./3 Because subjective accounts of workplace discrimination may be at odds, we have focused on whether and when a plaintiff had objective information suggesting that he was treated differently than someone in an unprotected class. For instance, in Cada, an age discrimination plaintiff was advised he would be terminated when a replacement was hired. A few months later, the replacement came on board. The plaintiff met her; he observed that she was much younger than he was and had less relevant experience. Nevertheless, the plaintiff waited eight months after meeting her to file his discrimination suit. Although there was some dispute when the statute began to run, we declined to toll. We reasoned that as soon as the plaintiff met his replacement and assessed her inferior qualifications, he had sufficient notice he might have been the victim of age discrimination. Subsequent delay in filing was in the circumstances not to be excused. Similarly, in Hentosh, the plaintiff tried to extend the statute of limitations on her sex discrimination claim by stating that she had not discovered that her supervisor was sexually involved with several colleagues until after the statute of limitations deadline had passed. But the heart of the plaintiff's claim in that case was that her

supervisor sexually harassed her by creating a hostile work environment. That she was in the dark about her supervisor's dalliances with coworkers did not offset the fact that she had the requisite objective knowledge that she was being sexually harassed well before the statute of limitations period expired. Finally, in Chakonas, we held that as soon as a 63-year-old police commander was forced to take early retirement, he was on notice of possible age discrimination. Notably, in Chakonas, we rejected the plaintiff's argument that as a law enforcement officer he was reluctant to "disrespect" the law by bringing an age discrimination suit. The plaintiff's "subjective philosophy," we stated, was irrelevant to the objective question whether a reasonable person would have known of discrimination.

 Jackson argues that he did not want to race to the courthouse merely because the RHA hired a white candidate over him. His respect for the gravity of filing a federal lawsuit is commendable. But when Jackson learned that RHA hired the white candidate, he knew that one possible explanation was racial discrimination. Jackson was not required to assume that this was the RHA's actual hiring motive. However, he was required to undertake some inquiry to verify or discard this theory. Jackson explains that he did not want to "agitate," because he could have endangered his job. We can understand his concern. Scholars have documented that black employees may be reluctant to complain about work conditions for fear of being characterized as "angry blacks." See Wilkens, 112 Harv. L. Rev. at 1965-66. But to honor this sort of excuse would seem to effectively nullify the timeliness requirement. And Chakonas does not allow us to consider subjective explanations for failing to file suit timely.

 Moreover, an objective look at the situation suggests that Jackson could have met his burden of inquiry in several fairly innocuous ways. Jackson certainly could have probed the relative merits of the two candidates by asking how he could position himself better for the next promotion. Indeed, some career consultants recommend this as a path to future promotions./4 He also could have casually asked his colleagues what they knew about Anderson. Indeed, he might have phoned Anderson directly under the guise of congratulating him. "Due diligence" does not require Jackson to break into Anderson's personnel files, as Jackson seems to think. Whatever many courses Jackson may have taken, the bottom line is that equitable tolling does not condone inaction. And given that tolling is an equitable remedy that adjusts the rights of two

innocent parties, "the negligence of the party invoking the doctrine can tip the balance against its application." See Cada, 920 F.2d at 453. However understandable Jackson's inaction was, we cannot toll the statute of limitations in this case.

III. Conclusion

In sum, the district court did not err in permitting the defendant to file an amended answer to the complaint. Further, the district court properly determined that Jackson failed to file within the period prescribed by the statute of limitations. Neither the doctrine of equitable estoppel nor the doctrine of equitable tolling are applicable in this case, and the dismissal of this case as time-barred is AFFIRMED.

FOOTNOTES

/1 The RHA's requirement of certification or capability of certification was permissible. HUD regulations state that "all persons employed by [Public Housing Authorities] as Housing Managers or Assistant Housing Managers responsible for 75 or more public housing units must have certification from an Approved Certifying Organization as a condition for payment of their salaries out of PHA operating funds, unless specifically exempt from this requirement under pertinent provisions of the regulation and this Handbook." Record Vol. 1 at Tab H, page 3 (HUD Certification Handbook). The Public Housing Manager Certification Program Handbook expressly states that "[t]o provide latitude to retain or hire an individual who may not immediately meet the standards for certification at the time when certification is first required," a certifying organization may issue a probationary certificate for a period of one year. Id. at 15-16. Furthermore, the term of a probationary certificate may be extended by one additional year, enabling the applicant sufficient time to obtain a permanent certificate. Id.

/2 It is irrelevant that Anderson delayed certification for several years. At the time Brewington told Jackson the two candidates were equals, Anderson was capable of certification.

/3 See, e.g., David B. Wilkins, On Being Good and Black, 112 Harv. L. Rev. 1924, 1963-65 (1999) (book review) ("[T]he vast majority of Americans believe that blacks and whites should have an equal chance to compete for jobs. Notwithstanding this strong and important consensus, however, old attitudes and beliefs about race have proven hard to shake. As study after study demonstrates, a substantial number of whites continue to hold

negative stereotypical views about blacks. These views frequently exist below the level of consciousness . . . . individual blacks know that they are in constant danger of being seen by whites as automatically embodying these negative traits." As a result, some black professionals remain silent in the face of perceived racism in order to make white workers feel comfortable that they are not "one of 'those blacks' who constantly complain about racism.").

/4 See, e.g., Camille Wright Miller, Not Advancing? Self Exam May Reveal Reasons, Roanoke Times & World News, May 1, 1997, at B1 ("Q: I've applied for several internally advertised openings. I haven't been given an interview for any of them. I'm very angry; I'm not being given a chance. A: . . . [M]eet with your supervisor and ask for an evaluation of your strengths and potential contribution to the company. Ask your supervisor to identify areas viewed as weaknesses that might prevent promotion.").